J-S50026-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
v. :
:
:
SEAN KRATZ :
:
Appellant : No. 150 EDA 2020

Appeal from the Judgment of Sentence Entered November 18, 2019
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0006072-2017

BEFORE: BENDER, P.J.E., SHOGAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY SHOGAN, J.: Filed: April 30, 2021

Appellant, Sean Kratz, appeals from the judgment of sentence entered on November 18, 2019, after he was convicted of first-degree murder of Dean Finocchiaro ("Finocchiaro"), second-degree murder of Finocchiaro while in the commission of a robbery, voluntary manslaughter of Thomas Meo ("Meo"), voluntary manslaughter of Mark Sturgis ("Sturgis"), conspiracy to commit first-degree murder of Finocchiaro, robbery of Finocchiaro, conspiracy to commit robbery of Finocchiaro, abuse of corpse of Finocchiaro, abuse of corpse of Meo, abuse of corpse of Sturgis, possessing an instrument of a crime with intent, possession of a weapon, and theft by receiving stolen property of Finocchiaro.[1]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 2502(b), 2503(a), 903, 3701(a)(1)(i), 5510, 907(a), 907(b), and 3925(a), respectively.

The penalty phase of the trial was scheduled to commence on November 18, 2019. On that date, the Commonwealth informed the trial court that it no longer wished to pursue the death penalty. N.T. (Trial), 11/18/19, at 3. Accordingly, the trial court sentenced Appellant to life imprisonment without parole for the murder of Finocchiaro, five to ten years of incarceration for the voluntary manslaughter of Meo, five to ten years of incarceration for the voluntary manslaughter of Sturgis, five to ten years for robbery, and, one to two years for each count of abuse of a corpse. The trial court directed the sentences to run consecutively and imposed no further penalty on the remaining counts. This appeal followed, and after careful review, we affirm.

We need not recount the underlying gruesome details of the crimes as they are not relevant to our disposition of the issues on appeal; however, the procedural history is pertinent. In the course of an investigation of the disappearance of three young men in early July of 2017, Bucks County detectives interviewed Appellant's cousin and co-defendant, Cosmo DiNardo ("DiNardo"). Based upon information disclosed in that interview, the detectives interviewed Appellant to ascertain his involvement in the murders of Finocchiaro, Meo, and Sturgis. The trial court described that meeting, as follows:

> When Appellant arrived to the police station, he was wearing a knee brace on his left knee and had two walking canes. He was not restrained with handcuffs during the interview. The detectives were in plainclothes.

At the beginning of the nearly four-hour interview at approximately 9:15 PM, Appellant was notified of his *Miranda* rights, both verbally and in writing. Appellant indicated by initials and signature on the *Miranda* warning card that he understood each of his rights and thereby waived those rights. Appellant was made aware that the statement was being audio and video recorded, that he did not have to speak with the detectives at all, and that he could stop speaking with the detectives at any time. The detectives' primary objection was "to get the guns," or the murder weapons.

Throughout the interview, Appellant told half-truths, lies, and attempted to "disassociate himself" from the DiNardo Farm and the murders which took place there on July 7, 2017. Through several changes in his story, the detectives became aware of his deceit. Appellant's mother, Vanessa Amodei, arrived at the interview, and Appellant also lied to her, "initially tell[ing] her he doesn't know where the guns are, yet within—it took her about 40 minutes to get him to tell her where the guns are." Eventually, at his mother's urging, Appellant agreed to show law enforcement where he had hidden the murder weapons.

At no point throughout the interview did the detectives become verbally or physically abusive to Appellant. Appellant himself stated that "he was not mistreated by Detective Chief McDonough or Detective Kemmerer." Notably, Appellant also never requested that the detectives stop questioning him at any point throughout the interview.

Following his statement, Appellant led police to his Aunt Diane's house on Susquehanna Road in Ambler, Pennsylvania. At approximately 2:00 AM on July 14, 2017, they arrived to the heavily wooded lot. There were no lights on at the property. Appellant, without the use of the walking canes, led the detectives up the driveway and beyond the front deck of the house. Appellant immediately pointed to the location of the two guns, carefully hidden in the ivy and plants on the other side of the deck from the driveway. Appellant was then taken into custody.

Trial Court Opinion, 3/31/20, at 9–11 (record references omitted).

In connection with ongoing guilty plea negotiations, on April 25, 2018, Appellant gave a statement confessing to his participation in the murders of Finocchiaro, Meo, and Sturgis. The trial court explained the backdrop of this videotaped statement, as follows:

> On behalf of Appellant, his attorney at the time, Attorney Wm. Craig Penglase,[2] initiated negotiations for a plea agreement with Assistant District Attorney ("DA") Kate Kohler and First Assistant District Attorney Gregg Shore. After several weeks of discussions, a plea agreement was reached on Monday, April 23, 2018 between Attorney Penglase and First Assistant DA Shore. DA Shore wrote down the terms of the agreement on a sticky note, which he copied, then gave a copy to Attorney Penglase. The note read:
> - 59 year min.
>
> Predicated upon
> 1) Satisfactory mitigation report to Commonwealth
> 2) [Appellant] interview (truthful)
> 3) Commonwealth speaking to victims' families
>
> The sticky note was not the extent of the plea agreement conversation, but it was meant to be the context for the next step in the process. For example, third-degree murder was not included on the sticky note, but it was verbally discussed and agreed upon. Finally, the agreement between DA Shore and Attorney Penglase resulted in a clear decision that "the interview was going to be used against him," barring any instance of the victims' families failing to agree with the negotiation.
>
> On April 24, 2018, Appellant met with his mother, Attorney Penglase, and Mitigation Specialist Michael Goodwin in the DA's office to discuss the plea deal. Chief of the Bucks County Detectives, Martin McDonough, along with Detective Coyne, brought Appellant to the meeting at the DA's office. Between the two detectives, at least one was stationed outside the conference

---

[2] On May 17, 2018, because a conflict arose between Attorney Craig Penglase ("Attorney Penglase") and Appellant, Attorney Keith Williams was appointed to represent Appellant. Appellant ultimately hired present counsel, A. Charles Peruto, Jr., on October 29, 2018. Trial Court Opinion, 3/31/20, at 14.

room throughout the day. Detective Chief McDonough testified that Appellant's mother was there when he brought Appellant in, and she was still there when he took Appellant back down to the sheriff's office.

As a result of this meeting, the April 25, 2018 proffer was scheduled. Attorney Penglase communicated to DA Shore that Appellant had accepted the terms of the Commonwealth's offer and wanted to proceed the next day with an interview under the terms of the agreement. Although no *Miranda* warnings were explicitly given on April 25, 2018, Appellant was accompanied by his counsel, Attorney Penglase, throughout the entirety of the interview. The first few minutes of the statement consisted of the detectives confirming that Appellant understood what was going on, that he was not being forced or coerced into giving the statement, and that if at any point he wanted to consult with his attorney, he was free to do so. Notably, the detectives also made sure to elicit Appellant's knowledge, understanding of, and acceptance of the fact that if he were to withdraw his guilty plea, Appellant's statement on this day could be used against him.

* * *

Appellant then proceeded to confess to murdering Finocchiaro and being present for, if not assisting with, DiNardo's murders of Meo and Sturgis. He further admitted to lying to the detectives in his first statement, given July 13, 2017. No transcript of this video was ever created, although the parties did discuss the possibility of doing so at several points throughout Appellant's case.

Trial Court Opinion, 3/31/20, at 11–14 (record references omitted).

On May 1, 2018, Appellant signed a guilty plea colloquy for a scheduled plea of guilty to third-degree murder to take place on May 16, 2018. However, on that date, Appellant decided that he no longer wanted to plead guilty and the matter was continued for a jury trial. Trial commenced on November 6, 2019, at the conclusion of which Appellant was found guilty of numerous offenses related to the three murders and sentenced as above-described.

- 5 -

Appellant raises the following issues for review:

1. Did the lower court err when it allowed inadmissible hearsay testimony at the pretrial hearings on April 15, 2019, with respect to DA Shore's testimony as to what was told to him by [Attorney] Penglase and DA Weintraub?[3]

2. Did the lower court err in denying [Appellant's] Motion to Suppress his April 25, 2018 statement based upon Pa.R.E. 410(a)(4) as it was not voluntarily, knowingly, and intelligently made, and the factual findings are not supported by the record and the legal conclusion drawn therefrom are incorrect?

3. Did the lower court err when it allowed Michael Goodwin to testify regarding communications derived from attorney-client privileged communications at the pretrial hearing, as he was part of the "Penglase" team?

4. Did the lower court abuse its discretion when it found that the uncontroverted testimony of Vanessa Amodei, [Appellant's] mother, was not credible?

5. Did the lower court err in denying [Appellant's] Motion to Suppress his April 25, 2018 statement as it was involuntarily, unknowingly and unintelligently given in the absence of *Miranda* warnings while in the presence of counsel, in violation of his Fifth Amendment rights since the factual findings are not supported by the record, and the legal conclusions drawn from those facts are incorrect?

6. Did the lower court err in denying [Appellant's] Motion to Suppress his April 25, 2018 statement based on the best evidence rule and parole evidence rule?

7. Did the lower court err in denying [Appellant's] Motion in Limine to Redact certain portions of the July 13, 2017 statement since the factual findings are not supported by the record and the legal conclusions drawn from those facts are incorrect, and as

---

[3] First Assistant District Attorney Gregg Shore's ("ADA Shore") testimony in fact was elicited during the January 14, 2019 hearing. ADA Shore did not testify during the April 15, 2019 hearing.

such, the decision of the [c]ourt and its findings of fact and conclusions of law of May 13, 2019 was in error?

8. Did the lower court err when it denied defense counsel's request to have expert IQ testimony of [Appellant] during trial, and as such, it was an abuse of discretion?

9. Did the lower court err in overruling defense counsel's objection to the Commonwealth's use of a full-time IT person during jury selection to investigate potential jurors' voter registration, Facebook, criminal and driving records etc., while the defense had no such ability?

10. Did the lower court abuse its discretion in denying [Appellant's] Motion for Change of Venire, and as such, the decision of the [c]ourt and its findings of fact and conclusions of law of May 13, 2019 was in error?

11. Did the lower court abuse its discretion in not ruling that comments made by the Commonwealth to the jury during closing argument with facts that were not in evidence and which prejudiced [Appellant] were improper, warranting a curative instruction?

Appellant's Brief at 7–8 (re-numbered for ease of disposition).

Appellant challenges the trial court's denial of the motion to suppress his April 25, 2018 statement, wherein he confessed to his involvement in the murders of Finocchiaro, Meo, and Sturgis. Appellant's Brief at 33. In tandem arguments, Appellant contends that the trial court erred when it allowed inadmissible hearsay testimony at the pretrial hearing with respect to ADA Shore's testimony, permitted Mitigation Specialist Michael Goodwin ("Mr. Goodwin") to testify to purported privileged communications, and its rejection of Vanessa Amodei's ("Ms. Amodei") testimony on credibility grounds. *Id.* at 33, 49, 63, 65, and 71.

The trial court held hearings on the motion to suppress on January 14, 2019, and April 15–16, 2019, which it summarized as follows:

> [T]he April 25, 2018 statement began with the detective asking Appellant: "You understand, as part of this interview, that if you decide to withdraw your guilty plea, or you file an appeal, this interview would be used against you?" Appellant responded that he did understand.
>
> Defense counsel argued that it is not possible to withdraw a guilty plea that has not formally been entered. Instead, defense counsel insisted that this [c]ourt must rely solely on the statement within the video, and thus the Parole Evidence Rule and Best Evidence Rule prohibited any consideration of the context surrounding the decision to give the statement. Attorney Peruto claimed no evidence outside of the agreement is admissible. Whereas the Commonwealth noted that what the agreement was and when it was reached and when it was communicated to the defendant is, of course, very relevant and admissible for Your Honor to determine whether or not to suppress this statement pursuant to Rule of Evidence 410.
>
> Over a continuing objection from Attorney Peruto, this [c]ourt heard testimony from DA Shore regarding the context of the plea negotiation and the April 25 statement. DA Shore confirmed that Attorney Penglase requested the April 25 meeting after communicating the plea offer to Appellant, and Appellant's subsequent decision to accept the offer and proceed with the interview.
>
> The Commonwealth wanted to call Attorney Penglase to confirm this testimony. However . . . it was not possible to call Attorney Penglase on this date. Instead, the parties discussed whether prior defense team mitigation expert, Michael Goodwin, should be permitted to testify regarding the April 24, 2018 meeting with Appellant and his mother. The only issue for which this [c]ourt would hear the testimony was to ascertain (1) whether Appellant's mother was present for the meeting, thus negating any attorney-client privilege, and (2) exactly what was conveyed to Appellant in terms of the details of the plea deal. The issue was deferred.

Trial Court Opinion, 3/31/20, at 17–18 (record references and internal quotation marks omitted).

### *ADA Shore's Testimony*

We deem it prudent to first resolve the question of whether ADA Shore's January 14, 2019 testimony constituted inadmissible hearsay. If we resolve this issue in Appellant's favor, we cannot consider that testimony in our review of the specifics of Appellant's plea negotiations and in our analysis of whether the April 25, 2018 statement should have been suppressed. Rather, our assessment would be limited to the contents of the videotaped statement.

Appellant lodged two objections to ADA Shore's testimony at the January 14, 2019 pretrial hearing during the following exchange:

Q: And did [Attorney] Penglase tell you what he would do with the offer that you extended him on April 23, 2018?

A: He said that he would go to his client that evening and present it to him.

Q: Did you hear from [Attorney] Penglase later that day?

A: I did.

Q: And what, if anything, did he tell you?

[Defense counsel]: Objection.

The Court: Basis?

[Defense counsel]: Hearsay.

The Court: How does it come in?

[Prosecutor]: I'm sorry, Your Honor?

The Court: Ms. Kohler, how does this come in?

[Prosecutor]: This comes in basically because, well, first of all, hearsay is admissible at a suppression hearing. This is a pretrial hearing. And Your Honor needs to be provided a full context of the discussions. But secondly, [Attorney] Penglase's statements to DA Shore essentially put in forth a—or put forth in motion a series of events that occurred afterwards.

The Court: The objection is overruled. Go ahead.

Q: What did [Attorney] Penglase tell you later that day?

A: He asked if we could set up a meeting for the next day in order to move things along. And he requested that that meeting occur at the District Attorney's Office.

And he requested that we make a room available to the defense for them to have a discussion with [Appellant], with [Appellant's] mother, with Attorney Penglase, with Mr. Goodwin, about where we were at and the negotiation that [Appellant] was to receive.

Q: Did he tell you anything about whether or not he had communicated your offer to the Appellant?

[Defense counsel]: Objection.

The Court: Overruled.

A: He said he did.

N.T. (Pretrial Hearing), 1/14/19, at 116–118.

Appellant, however, did not object to ADA Shore's recitation of his conversation with Attorney Penglase and [Bucks County District Attorney Matthew] Weintraub ("DA Weintraub") on May 16, 2018, concerning Appellant's subsequent decision not to plead guilty:

Q. And during that time on May 16th, did you remind [defense counsel] of the agreement regarding the statement?

- 10 -

A. [Defense counsel] both indicated their distress and the fact that there was an agreement that [Appellant] was backpedaling on.

* * *

And [DA] Weintraub joined us and at some time went back with [defense counsel and Appellant] to meet with [Appellant] in the back of the holding cell area where [DA] Weintraub represented to [Appellant] that if the plea is off we would be seeking the death penalty. And [Appellant] acknowledged to [DA] Weintraub that he knew we could use the statement against him.

N.T. (Pretrial Hearing), 1/14/19, at 124–125.

The trial court explained why ADA Shore's testimony was admissible:

Hearsay is an "out of court statement offered to prove the truth of the matter asserted." *Hedding v. Steele*, 426 A.2d 349 (Pa. 1987); Pa.R.E. 801(c). An out-of-court declaration containing another out-of-court declaration is double hearsay. *Commonwealth v. Laich*, 777 A.2d 1057, 1059, (Pa. 2001). In order for double hearsay to be admissible, the reliability and trustworthiness of each declarant must be independently established. *Id.* This requirement is satisfied when each statement comes within an exception to the hearsay rule. *Id.*

However, hearsay is admissible in a suppression hearing. *Commonwealth v. Bunch*, 477 A.2d 1372, 1376 (Pa. Super. Ct. 1984) (trial court properly admitted hearsay testimony at suppression hearing, "[s]ince a determination of probable cause may properly be based on hearsay"); *Commonwealth v. Seltzer*, 437 A.2d 988, 991 (Pa. Super. Ct. 1981).

First, DA Shore testified at the pre-trial hearing on January 14, 2019. The purpose of the testimony at issue was to establish that, to DA Shore's knowledge, the plea offer he presented to Attorney Penglase was going to be communicated to Appellant. This [c]ourt properly allowed this testimony because (1) hearsay is permitted at a suppression hearing, and (2) Attorney Penglase's statements to DA Shore put into motion a series of events that led to the April 25, 2018 interview. After the April 24 meeting, Attorney Penglase expressed to DA Shore that Appellant had accepted the terms of the Commonwealth's offer

and wanted to proceed the next day with an interview under the terms of the agreement.

Therefore, these statements, whether or not they were hearsay or double hearsay, were necessary to provide this [c]ourt with the full context of the discussions surrounding the plea deal, which in turn allowed this [c]ourt to rule on the admissibility of the April 25 interview. Appellant presented no evidence whatsoever that would move the "heavy burden" to show that the trial court has abused its discretion in considering this hearsay testimony at the suppression hearing. *Commonwealth v. Christine*, 125 A.3d 394, 398 (Pa. 2015).

Trial Court Opinion, 3/31/20, at 52–53 (record references omitted).

"An appellate court's standard of review of a trial court's evidentiary rulings, including rulings on the admission of hearsay . . . is abuse of discretion." **Commonwealth v. Walter**, 93 A.3d 442, 449 (Pa. 2014). We will not disturb an evidentiary ruling unless "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by evidence of record." **Commonwealth v. Fitzpatrick**, 204 A.3d 527, 531 (Pa. Super. 2019) (quoting **Commonwealth v. Cooper**, 941 A.2d 655, 667 (Pa. 2007)).

On appeal, Appellant asserts that hearsay testimony is admissible in a suppression hearing only to determine probable cause. He thus contends that ADA Shore's testimony as to what he was told by DA Weintraub and Attorney Penglase with regard to Appellant's acknowledgement that his April 25, 2018 statement would be used against him was impermissible double hearsay. Appellant's Brief at 37.

While cases holding that hearsay is admissible in a suppression hearing predominately concern evidentiary issues related to proving probable cause, *see e.g.*, *Commonwealth v. Bunch*, 477 A.2d 1372, 1376 (Pa. Super. 1984) (a determination of probable cause at a suppression hearing may properly be based on hearsay); *Commonwealth v. Jenkins*, 431 A.2d 1023, 1025 (Pa. Super. 1981) (hearsay testimony generally admissible at a suppression hearing to prove probable cause); *Commonwealth v. Seltzer*, 437 A.2d 988, 991 (Pa. Super. 1981) (hearsay testimony admissible to show probable cause), none of the case law suggests that hearsay testimony is admissible **only** to prove probable cause, including *Commonwealth v. Barrett*, 335 A.2d 476, 480 (Pa. Super 1975), cited by Appellant to support his argument. Indeed, in *Bunch*, the hearsay objection at the suppression hearing concerned the testimony of a detective who arrived at the crime scene after the four suspects were already in custody and was not relevant to a probable cause determination. *Bunch*, 477 A.2d at 1376. In holding that the trial court correctly concluded that the detective's testimony was admissible in *Bunch*, we observed that "[s]ince a determination of probable cause may properly be based on hearsay, the trial court did not err in admitting this testimony." *Id.* (citation omitted). Thus, a reasonable interpretation of *Bunch* is that hearsay is admissible at suppression hearings for reasons other than to establish probable cause.

Moreover, the trial court also permitted the testimony because Attorney Penglase's statements to ADA Shore "put into motion a series of events that led to the April 25, 2018 interview." Trial Court Opinion, 3/31/20, at 53. "[A]n out-of-court statement offered to explain a course of conduct is not hearsay." **Commonwealth v. Dent**, 837 A.2d 571, 577 (Pa. Super. 2003) (quoting **Commonwealth v. Cruz**, 414 A.2d 1032, 1035 (Pa. 1980)).

Herein, the objected-to testimony did not include any substantive information concerning conversations between Appellant and Attorney Penglase. ADA Shore testified that after Attorney Penglase presented the plea deal to Appellant, he requested that ADA Shore set up a meeting with Appellant, Appellant's mother, and defense counsel to discuss the plea deal. ADA Shore further testified that Attorney Penglase informed him that he had communicated the plea deal to Appellant. N.T. (Pretrial Hearing), 1/14/19, at 116–118. Thus, this portion of ADA Shore's testimony merely demonstrated that Attorney Penglase took the plea offer to Appellant and wanted to arrange a meeting, *i.e.,* ADA Shore described the course of conduct that led to Appellant's April 25, 2018 videotaped statement. At this juncture ADA Shore did not testify as to the specifics of the deal communicated to Appellant or whether Appellant was aware that his statement could be used against him at trial. When later in his testimony, ADA Shore stated that after Appellant had decided not to plead guilty, Appellant acknowledged that he knew that his statement could be used against him, no hearsay objection was lodged. Thus,

Appellant's hearsay argument as to this testimony is waived.[4] With respect to evidentiary rulings, "[e]rror may not be predicated upon a ruling that admits evidence unless . . . a timely objection . . . appears of record, stating the specific ground of objection if the specific ground was not apparent from the context." **Commonwealth v. Parker**, 104 A.3d 17, 28 (Pa. Super. 2014) (quoting Pa.R.Evid. 103(a)(1)). Therefore, the trial court did not abuse its discretion in admitting ADA Shore's testimony and we may review it when determining the merits of Appellant's motion to suppress his April 25, 2018 videotaped statement.

### Motion to Suppress

In seeking to preclude consideration of his April 25, 2018 statement, Appellant posited three reasons why the statement should be suppressed: it was given in the context of ongoing plea bargain negotiations and, therefore, inadmissible under Pa.R.E. 410(a)(4); the statement was given in the absence of his *Miranda* warnings;[5] and the statement was admitted in violation of the best evidence and parol evidence rules. Appellant's Brief at 33, 42, and 52.

_____

[4] During ADA Shore's testimony, the Commonwealth sought to introduce a copy of the sticky note with the basic terms of the plea offer into evidence. Appellant's counsel stated that he had "no objection . . . provided that I have a continuing objection to all of it." N.T. (Pretrial Hearing), 1/14/19, at 113. However, that continuing objection was based on counsel's position that any testimony regarding the terms of the negotiation violated the parol evidence and best evidence rules; it was not a hearsay objection. **Id.** at 105–107.

[5] **Miranda v. Arizona**, 384 U.S. 436 (1966).

### *Pa.R.E. 410(a)(4)*

Appellant first contends that introduction of his statement at trial was in violation of Pennsylvania Rule of Evidence 410(a)(4). Rule 410 provides, in relevant part:

> **(a) Prohibited Uses.** In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions:
>
> \* \* \*
>
> (4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later withdrawn guilty plea.

Pa.R.E. 410(a)(4).

Ordinarily, any statement made by a defendant during plea negotiations is inadmissible at trial during the Commonwealth's case-in-chief. *Commonwealth v. Widmer*, 120 A.3d 1023, 1026 (Pa. Super. 2015). However, we have recognized that during the plea-bargaining process, "a defendant is permitted to waive valuable rights in exchange for important concessions by the Commonwealth when the defendant is facing a slim possibility of acquittal." *Commonwealth v. Byrne*, 833 A.2d 729, 735 (Pa. Super. 2003) (citation omitted). Therefore, a defendant may waive his right to assert that a statement is inadmissible under Rule 410 as long as that waiver is knowing, voluntary, and intelligent. *Widmer*, 120 A.3d at 1027 (citing *Byrne*, 833 A.2d at 736).

The trial court found that Appellant waived his rights under Pa.R.E. 410(a)(4) based on the following:

In the instant case, the Commonwealth had extended a plea offer to Appellant. Appellant accepted the offer as evidenced by his decision to provide his voluntary statement on April 25, 2018. Additionally, Appellant signed a guilty plea colloquy on May 1, 2018. Credible evidence established that the Commonwealth offered Appellant the opportunity to plead guilty to third-degree murder, rather than first-or second-degree murder, thereby allowing Appellant to avoid the potential sentences of death or of life without parole. Appellant was offered a minimum of fifty-nine (59) years for his role in the murders of three young men and the subsequent cover-up of those murders. By accepting this offer, Appellant did not need to worry that he might receive the death penalty.

In order to receive the benefit of the negotiation, the Commonwealth required: (1) Appellant provide a truthful interview regarding his participation and role in these cases and (2) that the victims' families agree with the negotiation. Similar to *Widmer*, the Commonwealth predicated its plea bargain with Appellant upon Appellant waiving his rights pursuant to Rule 410. Like the DA in *Widmer*, DA Shore testified credibly that Appellant's attorney had been informed of the terms of the plea deal. Furthermore, DA Shore testified that the Commonwealth was going to use the statement regardless of whether Appellant entered into the plea, withdrew it, or appealed it. This testimony was corroborated by the fact that defense counsel's only concern regarding the use of the statement was whether the Commonwealth could use Appellant's statement in the event the Commonwealth withdrew the offer if the victims' families did not agree with it. This [c]ourt found no reason to believe the attorney did not relay this information to Appellant, especially after viewing the totality of the evidence.

What the evidence showed is that Appellant consulted with his attorney, his mother, and the mitigation specialist on April 24, 2018. He agreed to accept the terms of the offer after discussing it with his counsel. In fact, it was only after counsel and Appellant had significant time to discuss the plea deal that counsel informed the Commonwealth to set up the interview for the next day. Notably, Appellant presented no evidence to suggest that his prior

defense counsel misrepresented the terms of the Commonwealth's offer. Rather, Appellant withdrew any such allegation.

Appellant asked his attorney to arrange this interview date and voluntarily provided his statement on April 25, 2018. By accepting the terms of the plea deal and agreeing to provide a truthful statement, Appellant also agreed to the Commonwealth's condition that the statement could be used against him should he decide not to plead guilty.

While this [c]ourt found the evidence credible that the defense attorney was aware of the terms of the deal and conveyed this to Appellant, this [c]ourt especially found the recorded statement from April 25, 2018 enlightening. The terms of the plea deal were laid out broadly by the Detective in which he stated [Appellant] was there because he was agreeing to plead guilty to third degree murder and stated the sentence was an ongoing discussion between Appellant, his attorney, and the Commonwealth. The detective further discussed that Appellant agreed to provide a truthful statement, including additional information regarding the murders.

During the pretrial motion hearing, Detective Chief McDonough admitted that he "was not entirely versed on the specifics of what [the offer] was." However, he credibly testified that he understood the offer's terms to include "that whatever he told us in the room would be used against him in any future proceeding." Detective Chief McDonough admitted that he did not communicate that exact phrase to [Appellant].

However, this [c]ourt was able to view the eighty minute April 25, 2018 recorded video interview in its entirety. This [c]ourt found that Appellant's actions, demeanor, and statement in the video were relevant to show his state of mind, and that he knew the rights he was waiving. The following conversation occurred between the detective and Appellant:

Detective: You understand, as part of this interview, that if you decide to withdraw your guilty plea, or you file an appeal, this interview would be used against you?

Appellant: Okay.

- 18 -

Detective: You understand that?

Appellant: Correct.

Detective: Is anyone forcing you to come here to do this today?

Appellant: No.

Detective: And you've spoken to [Attorney] Penglase as to why you're here to do this today?

Appellant: Correct.

Detective: Before we go into the interview, is there anything you want to add or any questions?

Appellant: No, sir.

Detective: If at any time you want some private time with [Attorney] Penglase, you can go back into the room that is not audio recorded.

Appellant: Okay.

Detective: Need any water or a break, just let us know.

Appellant: Okay.

This [c]ourt found that Appellant appeared calm, confident, and comfortable as he discussed the details of the murders. Appellant did not express any confusion or concern. Furthermore, DA Shore testified that Appellant never appeared in distress or confused about what was occurring.

While Appellant may not have known the specifics of the evidentiary rule he was waiving, he clearly knew his statement would be used against him. Appellant's response makes it clear that he understood that his statement would be used against him and was clearly not surprised by the detective relaying this information.

Further proof of Appellant's understanding that his statement would be used against him is the conversation that occurred

between DA Shore and Appellant in the presence of Appellant's attorney. DA Shore credibly testified that on the day of the intended plea, DA Weintraub spoke with Appellant in the presence of his counsel about Appellant's decision to not plead guilty. DA Weintraub specifically reminded Appellant that due to this decision to not plead guilty, that the Commonwealth would not withdraw their notice to seek the death penalty and would use his statement against him. At that time, DA Shore testified that Appellant acknowledged to DA Weintraub that by not pleading guilty, his statement would be introduced at trial.

After conducting the pretrial hearing on January 14, 2019 and the supplemental hearings on April 15 and 16, 2019; and reviewing the evidence and briefs presented, this [c]ourt denied Appellant's Motion to Suppress his April 25, 2018 statement. The totality of the circumstances surrounding the plea negotiations in this case established that Appellant knowingly and voluntarily waived his rights as part of the plea agreement he reached with the Commonwealth. While Appellant may not have known the specifics of [Pa.R.E.] 410, his demeanor, actions, and statements demonstrate that he clearly knew his statement would be used against him. This [c]ourt refused to entertain Appellant's game of semantics that he knew the statement could be used against him if he withdrew his plea, but not if he did not go through with his plea.

Appellant certainly had a right to withdraw from the plea agreement and proceed to trial, but the Commonwealth was also entitled to the benefit of the bargain they negotiated and abided by, which included the right to use Appellant's April 25, 2018 statement against him at trial. The Commonwealth met its burden of proof in establishing that it was more than likely that Appellant understood his statement would be used against him if he did not plead guilty. Accordingly, Appellant's motion to suppress his statement on this basis was properly denied.

Trial Court Opinion, 3/31/20, at 32–36 (record references omitted).

Our standard of review in addressing a challenge to a trial court's denial

of a motion to suppress is "limited to determining whether the factual findings

are supported by the record and whether the legal conclusions drawn from

those facts are correct." ***Commonwealth v. Bell***, 871 A.2d 267, 271 (Pa. Super. 2005) (citations omitted). If the prosecution prevailed in the suppression court, we consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. ***Id.*** "Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn from them are in error." ***Id.*** In addition, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." ***Commonwealth v. Elmobdy***, 823 A.2d 180, 183 (Pa. Super. 2003) (citation omitted). The suppression court is also entitled "to believe all, part or none of the evidence presented." ***Commonwealth v. Benton***, 655 A.2d 1030, 1032 (Pa. Super. 1995). Finally, at a suppression hearing, the Commonwealth has the burden of "establish[ing] by a preponderance of the evidence that the evidence was properly obtained." ***Commonwealth v. Culp***, 548 A.2d 578, 581 (Pa. Super. 1988).

On appeal, Appellant asserts that the trial court erred when it determined that Appellant waived his rights under Pa.R.E. 410(a)(4) because the waiver was not knowing, voluntary, and intelligent. Appellant's Brief at 35. Appellant specifically avers that (1) the court misapplied a totality of the circumstances standard to determine whether Appellant waived his right under Rule 410(a)(4), rather than considering Appellant's subjective belief

regarding the terms of the plea; (2) the court relied on inadmissible hearsay evidence; (3) the court improperly considered privileged communications between Appellant and his counsel; and, (4) the court erred in not crediting the testimony of Appellant's mother, Ms. Amodei, regarding the terms of the agreement. *Id.* at 35–42.

Appellant first claims that the trial court should have applied a subjective standard, rather than a totality of the circumstances review, when determining whether Appellant believed the prosecution could introduce his statement at trial if he failed to plead guilty. In *Commonwealth v. Burno*, 154 A.3d 764 (Pa. 2017), the Pennsylvania Supreme Court, in considering whether a statement was inadmissible under Rule 410, held that "[t]he governing consideration regarding the admissibility of a confession is voluntariness, which we determine based upon the totality of the circumstances." *Id.* at 790. This holding is consistent with our jurisprudence explaining that issues of whether a waiver of *Miranda* rights was knowing, voluntary, and intelligent require an examination of the totality of the circumstances. *See, e.g.*, *Commonwealth v. Smith*, 210 A.3d 1050, 1058 (Pa. Super. 2019) (whether waiver of *Miranda* rights was knowing, voluntary, and intelligent depends upon the totality of circumstances surrounding the interrogation); *Commonwealth v. Harrell*, 65 A.3d 420, 433–434 (Pa. Super. 2013) (the test for determining the voluntariness of a confession and whether an accused

knowingly waived his rights looks to the totality of the circumstances surrounding the giving of the confession).

Moreover, a determination of exactly which promises constitute the plea bargain must be based upon the totality of the surrounding circumstances and involves a case-by-case adjudication. ***Commonwealth v. Farabaugh***, 136 A.3d 995, 1001–1002 (Pa. Super. 2016) (quotation omitted). It is the court's responsibility to determine whether an alleged term is part of the parties' plea agreement. ***Commonwealth v. Martinez***, 147 A.3d 517, 533 (Pa. 2016). While an accused's personal belief is relevant to ascertain if he exhibited an actual subjective expectation to negotiate a plea at the time of the subject discussion, the reasonableness of that subjective understanding depends upon the totality of the objective circumstances. ***Commonwealth v. Calloway***, 459 A.2d 795, 800–801 (Pa. Super. 1978) (quotation omitted). Thus, it was not error for the trial court to examine the totality of the circumstances to determine whether Appellant's waiver of his Pa.R.E. 410 rights was knowing, voluntary, and intelligent.

### *Mitigation Specialist Goodwin's Testimony*

We addressed Appellant's next claim that the trial court relied upon ADA Shore's impermissible hearsay testimony *supra*, and resolved that issue in the Commonwealth's favor. Thus, we turn to whether the trial court improperly considered testimony by a member of Appellant's defense team, Mr. Goodwin, at the April 15, 2019 suppression hearing. Appellant maintains that

Mr. Goodwin's testimony was protected by the attorney-client privilege and should not have been received. A related issue is whether the trial court erred in its credibility determination of Ms. Amodei concerning her recollection of what Attorney Penglase conveyed to Appellant regarding the terms of the plea deal prior to Appellant's April 25, 2018 videotaped statement.

The trial court found:

> Relevant to the appeal at bar, Mitigation Specialist Goodwin was asked to testify on the very limited issue of whether (1) Appellant's mother was present for the conversation on April 24, 2018 and (2) whether, while Appellant's mother was present, the plea deal was explained to and discussed with Appellant. Neither of these discrete areas of questioning amounted to an improper breach of attorney-client privilege.
>
> First, this [c]ourt heard testimony from Detective Chief McDonough and DA Shore, both of whom testified that Appellant's mother was present for the meeting on April 24, 2018. Furthermore, both testified to the fact that the purpose of the April 24, 2018 meeting was to discuss the plea deal. However, based on allegations in one of Appellant's reply memoranda that his mother either left early or arrived late or was not present for all of the meeting, further testimony was required. As it was the Commonwealth's burden to establish attorney-client privilege was waived by the presence of a third-party, this [c]ourt agreed that the additional testimony was necessary to determine whether the privilege was waived.
>
> Mitigation Specialist Goodwin testified that Appellant's mother was present that day, and that the plea deal was explained to both Appellant and his mother. Based on the cumulative testimony of Detective Chief McDonough, DA Shore, and Mitigation Specialist Goodwin, this [c]ourt concluded that Appellant's mother was present at the April 24, 2018 meeting. In light of the presence of a third party, Appellant's mother, this [c]ourt found that no confidentiality existed and, therefore, no breach of attorney-client privilege occurred.

Trial Court Opinion, 3/31/20, at 54–55 (record references omitted).

- 24 -

"In a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S. § 5916. However, if an accused made his communications to his attorney in the presence of other individuals, the communications would not be privileged. **Commonwealth v. Spanier**, 132 A.3d 481, 495–496 (Pa. Super. 2016).

Appellant contends that Ms. Amodei's presence at the meeting between him and members of the defense team did not vitiate the attorney-client privilege because Ms. Amodei "was acting as an agent of [Attorney] Penglase to facilitate representation of [Appellant]" and "her presence was essential to provide legal advice on the plea offer, since [Appellant] has a compromised intellect . . . and relied heavily on the advice . . . of his mother." Appellant's Brief at 38–39 (footnote omitted). Appellant further asserts that the Commonwealth failed to establish that Amodei was present throughout the entire meeting. **Id.** at 39.

"An issue concerning whether a communication is protected by the attorney-client privilege presents a question of law." **Spanier**, 132 A.3d at 491 (quoting **In re Thirty–Third Statewide Investigating Grand Jury**, 86 A.3d 204, 215 (Pa. 2014)). Therefore, our standard of review is *de novo*. **Spanier**, 132 A.3d at 491.

Our review of the record reveals that Ms. Amodei was present during the April 24, 2018 discussion Appellant conducted with his counsel regarding the Commonwealth's plea offer. Detective Chief McDonough testified that he escorted Appellant to the District Attorney's Office to attend the meeting and observed Ms. Amodei in the room with counsel and Appellant. N.T. (Pretrial Hearing), 1/14/19, at 95-96. Although he was not present during the substantive conversation between Appellant and defense counsel, ADA Shore also recalled seeing Ms. Amodei in the meeting room. *Id.* at 118. Notably, at the hearing, after the Commonwealth clarified that its questions concerning the April 24, 2018 meeting were limited to discussions occurring when Ms. Amodei was in attendance, Mr. Goodwin testified that Ms. Amodei was present when defense counsel discussed the terms of the Commonwealth's plea offer with Appellant. N.T. (Pretrial Hearing), 4/15/19, at 15-17. Furthermore, although Ms. Amodei maintained that she arrived late to the meeting after counsel and Appellant were already gathered, there was no evidence that any essential discussion concerning the plea occurred outside her. Ms. Amodei admitted that she attended the meeting with Appellant and counsel and that they discussed the Commonwealth's plea offer while she was present. *Id.* at 5–6. Accordingly, the trial court correctly found that the record showed that Ms. Amodei was present for the substantive discussion at the April 24, 2018 meeting.

Appellant nonetheless claims that even if Ms. Amodei was present during the April 24, 2018 meeting, her presence did not waive the attorney-client privilege because she was acting as an agent of defense counsel. Appellant offers no legal support for this position. While the attorney-client privilege extends to an agent of an attorney who assists in the provision of legal advice to the client, *see Commonwealth v. Noll*, 662 A.2d 1123, 1126 (Pa. Super. 1995), Ms. Amodei's presence during the discussions to support and advise Appellant did not morph Ms. Amodei into an agent of defense counsel. Ms. Amodei was neither an attorney nor employed by the defense team. Appellant's position advocating such a tenuous claim cannot is rejected.

### *Ms. Amodei's credibility*

Appellant's related argument is that the trial court abused its discretion because its credibility determination of Ms. Amodei was not supported by the record. The trial court assessed Ms. Amodei's credibility, as follows:

> In the instant case, Ms. Amodei's testimony was far from "uncontroverted," as Appellant claims. DA Shore, Detective Chief McDonough, and Mitigation Specialist Goodwin all testified, contrary to Ms. Amodei, that she was present for the meeting on April 24, 2018 wherein the plea deal was discussed among Attorney Penglase, Mitigation Specialist Goodwin, Appellant, and Ms. Amodei.

> Furthermore, both DA Shore and Detective Chief McDonough also testified that everyone's understanding was always that the statement could be used against Appellant if he did not follow through with the plea. The video of the interview clearly demonstrated that Appellant understood that the statement would be used against him, which he affirmed at the beginning of the interview. When asked if he had consulted with counsel regarding this specifically, Appellant again responded in

the affirmative. The only way this statement would not be used against him, were if the victims' families were not in agreement with the plea negotiation.

Ms. Amodei also testified regarding the conversations that took place on April 24, 2018. Ms. Amodei recalled that they were there to discuss the plea agreement. Ms. Amodei claimed that she came into the meeting late, but that she was still present during the discussion of a potential plea deal. She recalled that Appellant needed to make a truthful statement, that the term 59 years was used, and that Appellant would need to accept responsibility without saying he was forced by DiNardo.

Contrary to the testimony of all the other witnesses, Ms. Amodei next testified that if Appellant failed to provide a statement, there would be no deal, "and that if he made the statement and decided not to take a deal, if one was offered, that it wouldn't be used for anything else." In the May 13, 2019 Findings of Facts and Conclusions of Law, this [c]ourt found that the testimony of Ms. Amodei is entirely inconsistent with the other, credible testimony presented in this case. Ms. Amodei's testimony regarding the use of the statement was directly contradicted by DA Shore's testimony that he and Attorney Penglase specifically discussed that the statement would be used against him. Appellant acknowledged this in the presence of his counsel during the April 25, 2018 interview.

Therefore, to the extent that Ms. Amodei's testimony was inconsistent with and contradicted by the other credible evidence in this case, this [c]ourt did not credit her testimony. Being in the best position to determine the credibility of the witnesses, the appellate court should not overrule this [c]ourt's findings at the pre-trial hearings.

Trial Court Opinion, 3/31/20, at 55–56 (record references omitted).

"It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." *Commonwealth v. Byrd*, 185 A.3d

- 28 -

1015, 1019 (Pa. Super. 2018) (quoting **Elmobdy**, 823 A.2d at 183). "Where the testimony and other evidence supports the suppression court's findings of fact, we are bound by them and may reverse only if the court erred in reaching its legal conclusions based upon the facts." **Commonwealth v. Fudge**, 213 A.3d 321, 326 (Pa. Super. 2019) (internal quotation and quotation marks omitted). "This Court will not disturb a suppression court's credibility determination absent a clear and manifest error." **Id.**

On appeal, Appellant contests the trial court's characterization of Ms. Amodei's testimony as contradicted by other competent credible evidence because the other evidence referred to by the trial court was ADA Shore's alleged inadmissible hearsay testimony. Appellant's Brief at 41. Appellant also asserts that the trial court did not adequately explain why it discounted Ms. Amodei's testimony regarding her recollection of the April 24, 2018 meeting.

Neither position has merit. First, we have already decided that ADA Shore's testimony was properly admitted. Second, the trial court explained its credibility determination in its May 13, 2019 Findings of Fact and Conclusions of Law, to wit:

> The [c]ourt finds that the testimony provided by Ms. Amodei is not consistent with the other credible evidence presented in the case. Ms. Amodei's testimony regarding the statement's use is contradicted by Mr. Shore's testimony that he and Mr. Penglase specifically discussed that it would be used against him [Appellant] acknowledged this in the presence of his counsel, during the recorded interview that took place the following day. To the extent Ms. Amodei's testimony is inconsistent with and

- 29 -

contradicted by the other credible evidence in this case, the [c]ourt does not credit her testimony.

Findings of Fact and Conclusions of Law, 5/13/19, at 5 (record reference omitted). The trial court expanded upon this rationale in its Pa.R.A.P. 1925(a) opinion as recited above. As we do not discern a clear and manifest error, we will not disturb the trial court's credibility determination of the suppression witness. *Fudge*, 213 A.3d at 326.

In summation, the trial court properly concluded, under a totality of the circumstances, that Appellant waived his rights under Pa.R.E. 410(a)(4) as part of his plea negotiations with the Commonwealth and agreed and understood that his recorded confession given on April 25, 2018 would be used against him at trial if Appellant withdrew from the plea agreement. The trial court's findings were supported by record evidence and the applicable law and it did not err in denying Appellant's motion to suppress his statement under Pa.R.E. 410(a)(4).

### *Miranda* **Rights**

Appellant urges in his fifth issue that his April 25, 2018 statement should have been suppressed because it was "involuntarily, unknowingly, and unintelligently and was given in the absence of *Miranda* warnings . . . ." Appellant's Brief at 42. The trial court explained why *Miranda* was not violated in the context of Appellant's April 25, 2018 videotaped statement:

> At issue in this appeal is whether *Miranda* warnings need to be provided to a defendant already incarcerated, voluntarily seeking the interview with the police, and who has counsel present

for the entire duration of the interview. This is an issue of first impression for this Commonwealth. However, the Massachusetts Supreme Court has addressed a similar issue. *See Commonwealth v. Simon*, 923 N.E.2d 58 (Ma. 2010).

In *Simon*, the defendant was aware the police wanted to speak to him regarding a shooting. *Id.* at 66. The defendant had an opportunity to consult with counsel before the police questioned him. *Id.* It was determined that at the time he was questioned, it was a custodial interrogation but *Miranda* warnings were not needed because "the presence of an attorney during questioning, when combined with the opportunity to consult with the attorney beforehand, substitutes adequately for *Miranda* warnings." *Simon* at 67. This [c]ourt finds this reasoning persuasive and consistent with the holding of *Miranda* itself.

Although [Appellant] was in custody and not provided *Miranda* warnings prior to the April 25, 2018 interview, no such warnings were required. Appellant was represented by counsel at the time he volunteered to talk to the Bucks County Detectives, and his counsel was physically present the entire time the police were with Appellant. The presence of counsel next to Appellant throughout the duration of the interview served to adequately protect the Appellant's right against self-incrimination.

Appellant was informed that he could consult with his attorney as needed throughout the interview and that a private room would be provided to him. However, the most significant fact as to why this statement does not need to be suppressed is that Appellant agreed to give this interview pursuant to a plea agreement. He had ample opportunity to discuss the interview and its implications when he met with his attorney on April 24, 2018. After the lengthy conversation with his attorney on April 24, 2018, Appellant had a full day to contemplate his choice. This [c]ourt found that Appellant knew what he was doing when he requested the meeting with the detectives on April 25, 2018.

The facts in this case are not the type of situation the *Miranda* Court contemplated when it required police to inform a suspect of his rights prior to a custodial interrogation. On the contrary, *Miranda* determined that the presence of counsel during a custodial interrogation would adequately protect a defendant's rights. *Miranda*, [384] U.S. at 466. Additionally, it is important to emphasize that Appellant volunteered his statement on April

25, 2018 as a condition to the plea agreement that would save him from a potential sentence of death. As the Pennsylvania Supreme Court has determined, *Miranda* is not necessary when statements are provided voluntarily. [*Commonwealth v. Baez*, 720 A.2d 711, 720 (Pa. 1998)].

Trial Court Opinion, 3/31/30, at 37–39.

The trial court also concluded that Appellant's confession was voluntary:

Furthermore, when this [c]ourt viewed the totality of the circumstances, there was no evidence to suggest that Appellant's statement was made involuntarily, unknowingly, or unintelligently. Again, Appellant had agreed to provide the interview after he consulted with his counsel and mother in order to secure the plea deal. At the beginning of the interview, [Appellant] acknowledged that no one forced him to give the interview. The recording itself demonstrates that the tone of the interview was conversational and that no force or coercion was used by the interviewing detective or any other law enforcement present during the interview.

This [c]ourt found that Appellant's statement made on April 25, 2018 was voluntarily and knowingly given, and Appellant's right against self-incrimination was adequately protected by the consultation with and presence of his counsel. Appellant's motion to suppress his statement on this basis was properly denied.

Trial Court Opinion, 3/31/30, at 38–39.

Appellant avers that the trial court erred in concluding a recitation of Appellant's **Miranda** rights was rendered unnecessary by the presence of counsel. While Appellant acknowledges that the **Miranda**-guaranteed right to counsel was satisfied by his attorney's presence, he maintains that his right

to remain silent was not similarly protected. Appellant's Brief at 48.[6] We reiterate that our standard of review of a trial court's ruling on suppression motions is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Bell*, 871 A.2d at 271.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To ensure the protection of that right, the Supreme Court held in *Miranda* that any person "questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting

---

[6] Appellant additionally argues that the trial court incorrectly suggested that Appellant was not in custody at the time of the videotaped statement. This statement is unsupported. *See* Findings of Fact and Conclusions of Law, 5/13/19, at 6 ("On April 25, 2018 . . . [Appellant] was in custody . . . ."); *see also* Trial Court Opinion, 3/31/20, at 38 ("Although [Appellant] was in custody and not provided *Miranda* warnings on April 25, 2018, no such warnings were required.").

Appellant also rehashes his complaint about ADA Shore's inadmissible hearsay and the trial court's unfavorable credibility determination of Ms. Amodei in the context of the trial court's reliance and rejection of these witnesses' statements when rendering his decision on the *Miranda* issue. These contentions do not merit further discussion.

*Miranda,* 384 U.S. at 444). *Miranda* thus prohibits the use of statements that are the product of police coercion as evidence against an accused. *Moran v. Burbine,* 475 U.S. 412, 421 (1986).

With the precepts of *Miranda* in mind, we examine whether the presence of Appellant's counsel abrogated the *Miranda* requirements. As the trial court observed, there is no Pennsylvania precedent addressing this issue; however, we find guidance in the language of the *Miranda* Court wherein it observed that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant **unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination**." 384 U.S. at 444 (emphasis added). "As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it," a person must be warned that he has a right to remain silent, that if he does make a statement it may be used as evidence against him, and that he has a right to the presence of an attorney. *Id.* Pertinent to the issue at hand, the Supreme Court explained that "[t]he presence of counsel, in all the cases before us today, would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege. His presence would insure that statements made in the government-established atmosphere are not the product of compulsion." *Id.* at 466.

Based upon this language, we agree with the trial court that the presence of Appellant's attorney throughout the April 25, 2018 interview, when combined with the opportunity to consult with the attorney throughout the interview, substituted adequately for ***Miranda*** warnings. The ***Miranda*** Court itself recognized that the warnings are not the only permissible way to protect a suspect's right against self-incrimination in a custodial setting and that the presence of an attorney would constitute adequate protection to ensure that the police interrogation conformed "to the dictates of the privilege." ***Miranda***, 384 U.S. at 444, 466. As a matter of simple logic, if ***Miranda*** warnings are meant to protect a defendant until he can consult counsel, ***see Minnick v. Mississippi***, 498 U.S. 146, 150 (1990), they are not necessary when counsel is present. Furthermore, the presence of counsel assures that all the dictates of ***Miranda***, including the right to remain silent, are satisfied. ***Miranda***, 384 U.S. at 466 (attorney's presence would "insure that statements made in the government-established atmosphere are not the product of compulsion"). Therefore, Appellant's ***Miranda*** rights were not violated in this instance.

Appellant also claims that his confession to his role in the murders was not knowing, voluntary, and intelligent. Appellant's Brief at 45. Appellant challenges the voluntariness of the confession because it was required before the Commonwealth would extend a plea offer. ***Id.*** Appellant also insists again

that it was his understanding the statement would not be used against him if he decided not to proceed with plea. *Id.* at 45–46.

Individuals can give up their *Miranda* rights through a knowing, intelligent, and voluntary waiver. *Miranda*, 384 U.S. at 444. To make such a determination, two factors must be shown: (i) first, the relinquishment of the right must be voluntary in the sense that it was the product of a free and deliberate choice and not intimidation, coercion, or deception; "(ii) second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. "The voluntariness of a confession is determined from a review of the totality of the circumstances surrounding the confession." *Commonwealth v. Yandamuri*, 159 A.3d 503, 525 (Pa. 2017) (citation omitted).

We disagree that the fact that Appellant was required to make a confession to reap the benefits of the plea deal stripped the statement of its voluntariness. Appellant agreed to provide the interview after consultation with his counsel and his mother, thus voluntarily sacrificing his right to remain silent in order to secure the beneficial plea offer. He specifically acknowledged at the start of the interview that no one had forced him to give the interview. Moreover, counsel was present throughout the interview, which further ensured against any coercive influences. *See Commonwealth v. Cunningham,* 370 A.2d 1172, 1176 (Pa. 1977) (holding that interview was

not involuntary and noting that "[m]ost significant is the fact that counsel was present and was available to detect and describe even the most subtle coercive and suggestive influences if they in fact had existed"). Therefore, the trial court did not err in concluding, under the totality of circumstances, that Appellant's confession was knowing, intelligent, and voluntary.

### Best Evidence and Parol Evidence Rules

Appellant's final assault on the admissibility of the April 25, 2018 videotaped statement invokes the best evidence and parol evidence rules. We apply the following standard and scope of review when reviewing a challenge to a trial court's evidentiary rulings.

> When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.
>
> An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Commonwealth v. Talley*, 236 A.3d 42, 55 (Pa. Super. 2020) (quotation omitted).

As for the admissibility of the videotape under the best evidence rule, Appellant avers that the early portions of the interview establish that the videotape could be used only if Appellant withdrew his plea or filed an appeal. Appellant continues, "Neither event occurred. If the videotape accurately

reflects the understanding of the parties, the best evidence rule precludes its admission."  Appellant's Brief at 53.

The trial court addressed the best evidence argument, as follows:

> In the instant case, Appellant's argument is illogical.  In his Concise Statement, Appellant claims that the "lower court erred in denying [Appellant's] Motion to Suppress his April 25, 2018 statement based on the Best Evidence Rule and Parole Evidence Rule."

> However, at the suppression hearing and in briefs, Appellant argued that this [c]ourt should not have been allowed to hear the testimony of DA Shore or Mitigation Specialist Goodwin regarding Appellant's understanding of the plea deal.  Rather, the [c]ourt should have been limited to only the videotape itself under the best evidence rule.  Therefore, this [c]ourt is unable to conceive how it could have suppressed the April 25, 2018 interview at Appellant's request while Appellant simultaneously claimed the video was the "best evidence."

> Another error in this argument is that the videotape is not necessarily the best evidence.  There was a written plea agreement, albeit on a sticky note, detailing the known terms of the plea.  Therefore, the best evidence in this case would more appropriately be the written form of the agreement rather than the snippet of the video in which the detectives and Appellant briefly discussed some of the terms of the plea agreement.

> Even if the video is the best evidence, Appellant was notified within the first few minutes of the video that the interview would be used against him in the event he did not accept the plea deal and instead decided to go to trial.  Appellant stated that he understood, did not ask any questions or for clarification regarding the plea, or to speak privately with his attorney who was seated right next to him.

> * * *

> Furthermore, Appellant's singular supporting citation for the best evidence rule was [*Commonwealth v.*] *Lewis*, [623 A.2d 355, 357 (Pa. Super. 1993)] and the situation here is clearly distinguishable.  In *Lewis*, the video was not introduced into

evidence, but the court allowed testimony about what would have been on the video to establish a material fact - that the appellant had shoplifted. In the instant case, both the written details of the plea agreement and the full video wherein the detectives discuss some of the terms of the plea deal were admitted into evidence. The contextual testimony from DA Shore and Mitigation Specialist Goodwin served only to establish that Appellant had the opportunity to discuss the plea with his family and attorneys before he decided to go through with the plea, and thus scheduled the proffer.

Therefore, this [c]ourt found that the application of the Best Evidence Rule to the video was irrelevant. Appellant knew that a truthful statement was a prerequisite of the plea, he asked his attorney to schedule the proffer, he was told and agreed that it could be used against him if he did not go through with the plea deal, and his counsel was by his side throughout the entire interview.

Trial Court Opinion, 3/31/20, at 42–43 (record references omitted)

The best evidence rule is set forth in Pa.R.E. 1002 and provides, in relevant part: "An original writing, recording, or photograph is required in order to prove its content" unless otherwise provided by law." Pa.R.E. 1002. The rule applies when the contents of recorded evidence are at issue. ***Commonwealth v. Lewis***, 623 A.2d 355, 358 (Pa. Super. 1993) (internal quotations and citations omitted).

Like the trial court, we are somewhat confounded by Appellant's argument advocating both for and against the videotaped statement as the best evidence. Nevertheless, we construe Appellant's position as asserting that the beginning portion of the videotaped statement concerning Appellant's understanding of the plea deal and specifically, the circumstances under which the statement could be used against him, is the best evidence of the terms of

the plea and outside testimony regarding the plea was not admissible. Therefore, Appellant urges that because the trial court erroneously considered the testimony of ADA Shore and Mr. Goodwin as to Appellant's belief regarding potential use of the statement, the substance of the videotaped statement, *i.e.*, the confession, should be suppressed.

We reject Appellant's best evidence argument because it is grounded in the faulty legal premise that the holding in *Lewis* precluded ADA Shore's and Mr. Goodwin's testimony.  In *Lewis*, the defendant was arrested after he and a companion attempted to steal a Walkman from a Sears Department store. A store security guard, who observed their actions, apprehended the two as they left the store. 623 A.2d at 356–357.  At trial, and over the defendant's objection, the responding police officer testified regarding his observations of the defendant as recorded on a store security camera.  The actual recording, however, was not presented as evidence.  *Id.*

On appeal, a panel of this Court held the officer's testimony, **absent introduction of the video itself**, violated the best evidence rule.  *Lewis*, 623 A.2d at 359.  Conversely, herein, the best evidence rule does not prevent a witness from testifying to the contents of the videotape because the videotape itself was admitted into evidence.  Accordingly, we discern no abuse of discretion in the admission of ADA Shore's and Mr. Goodwin's testimony explaining the contours of the plea agreement.

Nor do we credit Appellant's argument that the parol evidence rule precluded extrinsic evidence concerning the specifics of the plea deal. Generally, the parol evidence rule bars evidence of an oral agreement where the parties have deliberately placed their entire agreement in writing, and that writing represents the parties' entire contract. *Toy v. Metropolitan Life Insurance Co.*, 928 A.2d 186, 204 (Pa. 2007).

The trial court determined that the parol evidence rule did not bar extrinsic evidence concerning the plea deal:

> Appellant claims that the recording of the April 25, 2018 interview is a writing for purposes of the Parole Evidence Rule "since the content of the Proffer were transcribed to transcript." However, no transcript of the video was ever prepared. Appellant's argument would be more compelling if he claimed that the sticky note plea deal barred the entry of the video and corresponding testimony, but one glance at the sticky note makes it clear that it was not the entirety of the agreement between the parties.

> Both the sticky note and the discussion of the plea deal on video were incomplete versions of the plea agreement. This [c]ourt heard reliable testimony from DA Shore and defense team member Mitigation Specialist Goodwin that there was a plea deal to which the parties had agreed, the deal had been communicated to Appellant in the presence of his attorneys and mother, and that Appellant had agreed to the plea, thus necessitating the need for the April 25, 2018 interview. Therefore, this [c]ourt found that the Parole Evidence Rule did not necessitate the exclusion of the video or the testimony regarding the context of the video.

Trial Court Opinion, 3/31/20, at 44–45 (record references omitted).

In his brief, Appellant contends that "[t]he confession of April 25, 2018 is a writing for purposes of the parol evidence rule, since it was reduced to a transcript." Appellant's Brief at 55. This representation is belied by the

record. A transcript of the April 25, 2018 interview was not included in the record certified to us on appeal nor does the docket indicate that a transcript was either requested or lodged. Furthermore, the trial court stated that there was not a written transcript of the videotaped statement. *See* Trial Court Opinion, 3/31/20, at 44 ("no transcript of the video was ever prepared."). Appellant does not refute the trial court's finding in this regard.

Appellant also argues that "[i]f the Commonwealth believes that the videotape does not accurately reflect the parties' intent, as is suggested, [it is] arguing that parol evidence should be admissible to reflect the intent of the parties. In such instances the best evidence rule precludes its admission . . . ." Appellant's Brief at 55–56 (record references and internal quotations omitted). As we previously determined the best evidence rule did not operate to preclude ADA Shore's and Mr. Goodwin's testimony, there is no merit to this aspect of Appellant's argument.

Finally regarding the admissibility of the videotape, Appellant asserts that "if the Commonwealth argues that there was no agreement on the circumstances of when the videotape could be used at trial, they are then conceding that the interview was simply plea negotiations, which renders the videotape inadmissible under Pa.R.E 410(a)(4). . . . ." Appellant's Brief at 56. Since the Commonwealth's position clearly is that there was an agreement in place concerning the videotape's admissibility at trial and Appellant agreed to its use, *i.e.*, a stance directly opposite to that now propounded by Appellant,

no discussion of this parol evidence preclusion theory is warranted. Accordingly, for all the above reasons, the trial court did not abuse its discretion in admitting ADA Shore's and Mr. Goodwin's testimony concerning the circumstances surrounding the April 25, 2018 statement under the best evidence and parol evidence jurisprudence.

### *Motion in Limine*

In his seventh issue, Appellant contests the trial court's partial denial of his motion *in limine* to redact certain portions of Appellant's July 13, 2017 interview with the Bucks County Detectives. Appellant explained that the motion:

> sought to redact evidence that was irrelevant, premised on hearsay, highly prejudicial, and referenced polygraphs and plea bargains. There were direct and indirect accusations of lying, and questioning by the detectives comparable to a prosecutor offering their opinion on the truth or falsity of evidence offered by a criminal defendant. It also contains [Appellant's] extra-judicial statements in partial response to this interrogation. This evidence was impermissible, inflammatory, irrelevant and prejudicial to the defense during trial.

Appellant's Brief at 56–57 (record references omitted). The trial court denied the bulk of Appellant's motion *in limine*, reasoning:

> In the instant case, on December 31, 2018, Appellant filed a motion *in limine* to redact the July 13, 2017 statement. Appellant claimed that the entirety of the videotape was "impermissibly inflammatory and prejudicial to the defendant." In the alternative of suppressing the entire statement, Appellant asked this [c]ourt to redact portions of the recorded statement.
>
> Appellant argued that some of the evidence should be excluded pursuant to Pennsylvania Rule of Evidence 402 on the grounds of prejudice, confusion, or waste of time. Specifically,

- 43 -

Appellant objected to the portions of the videotape wherein the detectives' statements and questions amounted to "direct and indirect accusations of lying" and were "based on or prefaced with hearsay from alleged witnesses, unnamed sources and Co-defendant Cosmo DiNardo himself." Finally, Appellant claimed he was so "worn down by the time the Detectives asked the same questions for the third, fourth and fifth time with no intention of backing off unless and until [Appellant] confessed to the murder of Dean [Finocchiaro]." *Id.*

However, the record does not support Appellant's argument. Firstly, the recorded interview was highly relevant to proving Appellant's involvement in the murders. The question, then, is whether the statements made by the detectives, offered not for their truth but rather as an investigative tool, were unfairly prejudicial. The issue, in other words, is whether the detectives['] statements regarding evidence disclosed by DiNardo tend to suggest that the jury make their decision on an improper basis or serve to divert the jury's attention away from its duty of weighing the evidence impartially. Pa.R.E. 403 Comment. This [c]ourt found that the detectives['] statements, used as an investigative tool, were not unfairly prejudicial.

For example, Appellant's first redaction request was as follows:

> Detectives: When did Cosmo [DiNardo] give you the guns?
>
> Appellant: He didn't give me no guns.
>
> Detectives: When you guys were at the farm, he didn't give you no guns? He didn't ask you to hold anything for him?
>
> Appellant: No.

Appellant argued that this portion of the video should be redacted on the grounds that it was "hearsay since this information came from Cosmo DiNardo."

However, this portion of the recorded interview was not published to the jury to assert the truth of the matter that DiNardo gave him the guns. Rather, it was published to the jury as part

- 44 -

of the totality of the statement to show the nature of the interview and the demeanor of both Appellant and the detectives. Furthermore, it served to explain the detectives' conduct throughout the investigation. Based on their continued questioning, the detectives were able to discern that Appellant was changing his story and, therefore, lying.

In rendering the May 13, 2019 Findings of Facts and Conclusions of Law, this [c]ourt concluded that Appellant had no basis to assert that his statements were not freely and voluntarily given or extracted by any sort of threats or violence. Appellant voluntarily engaged with the detectives and waived his right to the assistance of counsel. Furthermore, the factual findings of the record support the statements made by the detectives while questioning Appellant on July 13, 2017. The probative value of the video, in its entirety, was not outweighed by the potential for prejudice against Appellant, with the exception of the portions mentioning polygraphs or plea bargains which were redacted by agreement between the parties. Finally, the parties also provided proposed cautionary/curative instructions and agreed upon the final instructions given to the jurors.

Trial Court Opinion, 3/31/20, at 47–49 (record references omitted).

In reviewing the grant or denial of a motion *in limine*, this Court applies an abuse of discretion standard of review. *Commonwealth v. Stokes*, 78 A.3d 644, 654 (Pa. Super. 2013) (quotation omitted). "An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Commonwealth v. Alicia*, 92 A.3d 753, 760 (Pa. 2014) (quotation omitted).

Appellant does not identify the specific portions of the interview which he claims should have been redacted. Rather he proposes three reasons to

support redaction of the statement: 1) a number of the comments and questions the detectives posed to Appellant were based on hearsay from unnamed sources and DiNardo; 2) many of Appellant's statements were inadmissible because they were made when he was "overwhelmed, exhausted, and when his capacity for self-determination was critically impaired"; and, 3) "the direct and indirect accusations of lying made by the detectives . . . should be excluded since the probative value is outweighed by the danger of unfair prejudice." Appellant's Brief at 58–60.

Regarding Appellant's position that the detectives referenced inadmissible hearsay during the July 13, 2017 interview, particularly the information provided to them by DiNardo, we conclude that those questions and comments were not admitted for the truth of the matter asserted; rather, they explained the course of conduct undertaken by the detectives in their efforts to encourage Appellant to reveal the location of the murder weapons. "Such statements are not hearsay." *Commonwealth v. Hardy*, 918 A.2d 766, 777 (Pa. Super. 2007) (citation omitted); *see also Commonwealth v. Manivannan*, 186 A.3d 472, 482–483 (Pa. Super. 2018) (quoting *Commonwealth v. Dent*, 837 A.2d 571, 579 (Pa. Super. 2003)) ("It is, of course, well established that certain out-of-court statements offered to explain a course of police conduct are admissible. Such statements do not constitute hearsay since they are not offered for the truth of the matters asserted; rather, they are offered merely to show the information upon which police

acted."). Additionally, when Appellant lodged a hearsay objection to the July 13, 2017 statement at trial, the trial court, with Appellant's consent, gave the following curative instruction:

> All right. A moment ago, ladies and gentlemen, there was an objection by the defense regarding a statement by the interviewing detectives essentially that Cosmo DiNardo said this. As you'll note, I overruled that objection and allowed that information to be presented.
>
> I'm sure you have heard the term hearsay, which in a broad sense is essentially any statement that's not made here in this courtroom and is being utilized and presented to you, but there are many exceptions to that.
>
> Here I have determined that you can hear those statements from the detectives not for the truth that that is necessarily what Cosmo DiNardo said, but to have it presented as essentially an investigative tool that the detective is utilizing in an attempt to try to elicit information.
>
> That is the reason that information is allowed to be presented to you and that I have ruled that it can come in in that fashion.

N.T. (Trial), 11/8/19, at 14–15.

In light of the court's instruction, which jurors are presumed to follow, it is reasonable to assume that the jurors did not consider the objected-to portion of the detectives' questioning for the truth of the matter asserted. Accordingly, the trial court did not err in failing to redact the portions of the July 13, 2017 statement that Appellant challenges as hearsay.

Appellant further asserts that some of the questioning occurred after he was exhausted from the four-hour interview. Appellant does not pinpoint when exhaustion set in, nor does he identify any particular statement that

indicates his weariness. In any event, we do not credit Appellant's position that his mental state, in this instance, required a redaction.

Generally speaking, "voluntary extrajudicial statements made by a defendant may be used against a defendant even though they contain no admission of guilt." ***Commonwealth v. Simmons***, 662 A.2d 621, 635 (Pa. 1995). Moreover, while Pa.R.E 403 empowers courts to "exclude relevant evidence if its probative value is outweighed by . . ., unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time . . .", the probative value of the July 13, 2017 videotaped statement in this matter outweighed any prejudicial effect.

> [W]hen a person has committed a crime, and knows that he is wanted for it, any attempt by that person to . . . give false statements . . . may be admissible as evidence of consciousness of guilt, and may, along with other evidence in the case, form a basis from which guilt may be inferred.

***Commonwealth v. Pestinikas***, 617 A.2d 1339, 1347–1348 (Pa. Super. 1992); ***see also Commonwealth v. Flamer***, 53 A.3d 82, 88 (Pa. Super. 2012) (the highly probative nature of defendant's consciousness of guilt clearly outweighs any undue prejudice arising from its admission); ***Commonwealth v. Chapman***, 136 A.3d 126, 128 (Pa. 2016) (defendant's lies to police during their investigation evidenced his consciousness of his guilt). Thus, the trial court did not abuse its discretion in denying the motion *in limine* to Appellant's statements allegedly made when his mental capacities were compromised by alleged exhaustion.

We turn now to the impact of the moments in the detectives' interview with Appellant wherein they accused Appellant, directly or indirectly, of lying. We have held that instances where police accused a suspect of lying are subject to redaction because "their statements were akin to a prosecutor offering his or her opinion of the truth or falsity of the evidence presented by a criminal defendant, and such opinions are inadmissible at trial." *Commonwealth v. Kitchen*, 730 A.2d 513, 521–522 (Pa. Super. 1999) (citing *Commonwealth v. Henry*, 706 A.2d 313 (Pa. 1997)). Thus, we agree with Appellant that the trial court abused its discretion by failing to redact the portions of the July 13, 2017 statement wherein the detectives declared that Appellant was untruthful.

That being said, the admission of the detectives' accusatory statements was harmless error. An error is harmless if it could not have contributed to the verdict. *Commonwealth v. Wright*, 961 A.2d 119, 143 (Pa. 2008). The Commonwealth bears the burden of establishing the harmlessness of the error. *Commonwealth v. Green*, 76 A.3d 575, 582 (Pa. Super. 2013).

> This burden is satisfied when the Commonwealth is able to show that: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial [e]ffect of the error so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* (quoting ***Commonwealth v. Laich***, 777 A.2d 1057, 1062–1063 (Pa. 2001) (internal citations omitted)).

On April 25, 2018, nine months after Appellant was interviewed on July 13, 2017, he gave a recorded statement as a condition of his plea agreement with the Commonwealth. Prior to describing the specifics of the crimes, Appellant represented that he would be truthful and would correct any misstatements made in his prior interview. Appellant then provided a confession regarding his role in the murders and cover-up, admitting that he shot Finocchiaro. Therefore, to the extent the jury impermissibly heard the detectives accuse Appellant of lying during July 13, 2017 interview, the fact that Appellant had been untruthful was corroborated by his own admission in the April 25, 2018 statement played to the jury. Additionally, the evidence of Appellant's guilt, particularly his confession, was overwhelming. Accordingly, any error resulting from the admission into evidence of the detectives' unredacted accusations of untruthfulness on July 13, 2017, did not contribute to the jury's verdict and was harmless.

### Preclusion of Expert Testimony

Appellant eighth claim is of evidentiary error in the trial court's denial of his request to present expert testimony regarding Appellant's intelligence quotient score ("I.Q.") during trial. Appellant's Brief at 61. The trial court disallowed the testimony, reasoning:

> In all cases, a defendant is required by the Pennsylvania
> Rules of Criminal Procedure to comply with motions filed by the

Commonwealth for pretrial discovery. Pa.R.Crim.P. 573(C)(1). This includes the "results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case." Pa.R.Crim.P. 573(C)(1)(a). Furthermore, if a defendant intends to call an expert witness, there is a continuing duty to disclose the intent to call the expert and any evidence or report to which the expert may testify:

> (2) If an expert whom the defendant intends to call in any proceeding has not prepared a report of examination or tests, the court, upon motion, may order that the expert prepare and the defendant disclose a report stating the subject matter on which the expert is expected to testify; the substance of the facts to which the expert is expected to testify; and a summary of the expert's opinions and the grounds for each opinion.

Pa.R.Crim.P. 573(C)(2).

> The remedy for either party failing to comply with this rule is to (1) order such party to permit discovery or inspection, (2) grant a continuance, or (3) prohibit such party from introducing evidence not disclosed, other than testimony of the defendant. Pa.R.Crim.P. 573(E); *see also Commonwealth v. Mendez*, 74 A.3d 256 (Pa. Super. Ct. 2013), appeal denied, 87 A.3d 319 (Pa. 2014). To sanction a defendant for discovery violations, the court may "enter such other order as it deems just under the circumstances.["] Pa.R.Crim.P. 573(E).

> It is perfectly within the trial court's discretion to disallow a defendant from presenting the testimony of an expert witness for failing to comply with discovery deadlines to produce an expert report. *See Commonwealth v. Radecki*, 180 A.3d 441 (Pa. Super. Ct. 2018) (the Superior Court found that the trial court did not abuse its discretion in disallowing defendant to present the testimony of his medical expert because defendant failed to comply with several discovery deadlines to submit an expert report prepared by the doctor, and the record did not indicate that the doctor ever prepared an expert report).

> On January 18, 2018, the Commonwealth filed a request for pre-trial discovery. On February 23, 2018, March 9, 2018, April 5, 2018, July 31, 2018, and August 1, 2018, the District

Attorney submitted additional requests for pre-trial discovery, specifically asking for the results or reports of any physical or mental examination of Appellant and/or any evidence to which an expert would testify at trial. The Commonwealth never received any expert report.

The time of trial was the first-time defense counsel made the Commonwealth aware that they would like to call Psychologist [Dean] Dickson [("Dickson")] to testify as an expert witness in the guilt phase. Such late "notice" did not give the Commonwealth time to review the expert's report, respond to the expert report, retain their own expert, or to conduct their own testing of Appellant. The defense "essentially surprised the Commonwealth with an expert witness during the guilt phase."

This left the [c]ourt with three options to remedy the defense team's procedural failure. The first option was to order the defense team to permit discovery or inspection. Pa.R.Crim.P. 573(E). However, it was the final day of testimony in the trial. Even ordering the defense team to produce a copy of the expert report for the Commonwealth to review would not have been an adequate remedy because the Commonwealth would have no opportunity to respond in a meaningful way aside from cross-examination of the witness. There would be no opportunity to retain their own expert or conduct their own test.

The second option was to continue the trial. Pa.R.Crim.P. 573(E). At this point, the trial had already been continued twice, on May 16, 2018 and February 27, 2019. The parties had endured a week-long voir dire to secure the venirepersons, the jurors had been asked to make arrangements to be available for the lengthy trial, and the parties had already presented a week of testimony and evidence. Furthermore, the jurors had been selected, sworn, and heard five days of testimony at the time counsel first raised an intention to submit this expert testimony. It is settled law that jeopardy attaches once a jury is empaneled and sworn. *See Downum v. United States*, 372 U.S. 734 (1963) (The U.S. Supreme Court ruled against a second prosecution of a defendant whose first trial ended immediately after the jury had been sworn). To continue the trial at that point would have been inappropriate, a waste of judicial resources, and it would have triggered constitutional ramifications related to the double jeopardy clause.

The third option this [c]ourt faced, as defined in the rules of criminal procedure, was to preclude the defense's requested expert testimony. Pa.R.Crim.P. 573(E). The defense team's complete and utter failure to comply with the rules put the Commonwealth "in a position where our hands have been completely tied." This [c]ourt "struggled with this . . . in a way to find that this is at all appropriate and admissible." Ultimately, this [c]ourt could conceive of no other order it could enter that would be just under the circumstances. The only just option was to exclude the expert testimony.

Trial Court Opinion, 3/31/20, at 51–52 (record references and some citations omitted).

Appellant contends that the expert testimony concerning his I.Q. would support his claim that he did not intelligently waive his Pa.R.E. 410(a)(4) rights and/or **Miranda** rights and that his mother's presence at the April 24, 2018 was necessary in assisting the defense team. Appellant's Brief at 61.[7]

"Our standard of review in cases involving the admission of expert testimony is broad. Generally speaking, the admission of expert testimony is a matter left to the discretion of the trial court, and its rulings will not be reversed absent an abuse of discretion." **Commonwealth v. Watson**, 945 A.2d 174, 176 (Pa. Super. 2008) (citation and quotation marks omitted).

Concerning pretrial disclosure of expert reports during discovery, Pa.R.Crim. P. 573 provides, in pertinent part, as follows:

**Rule 573. Pretrial Discovery and Inspection**

---

[7] Defense counsel referenced Appellant's I.Q. score of 79 in his opening statement. N.T. (Trial), 11/6/19, at 45, 51, and 55.

**C) Disclosure by the Defendant.**

(1) In all court cases, if the Commonwealth files a motion for pretrial discovery, upon a showing of materiality to the preparation of the Commonwealth's case and that the request is reasonable, the court may order the defendant, subject to the defendant's rights against compulsory self-incrimination, to allow the attorney for the Commonwealth to inspect and copy or photograph any of the following requested items:

> (a) results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, that the defendant intends to introduce as evidence in chief, or were prepared by a witness whom the defendant intends to call at the trial, when results or reports relate to the testimony of that witness, provided the defendant has requested and received discovery under paragraph (B)(1)(e);

> * * *

> **(D) Continuing Duty to Disclose.** If, prior to or during trial, either party discovers additional evidence or material previously requested or ordered to be disclosed by it, which is subject to discovery or inspection under this rule, or the identity of an additional witness or witnesses, such party shall promptly notify the opposing party or the court of the additional evidence, material, or witness.

Pa.R.Crim.P. 573 (C), (D).

Appellant concedes that he did not provide notice to the Commonwealth as required by Rule 573(1)(a). Appellant's Brief at 62–63. However, Appellant now claims that Mr. Dickson's expert testimony was admissible under Pa.R.Crim.P. 568, which dictates the notice requirements for presentation of expert evidence of a mental condition. *Id.* at 62. **See** Pa.R.Crim.P. 568 (a defendant intending to introduce expert evidence relating

to a mental disease or defect or any other mental condition bearing on the issue of guilt, must file "not later than the time required for filing an omnibus pretrial motion . . . a notice of the intention to offer this expert evidence, and shall serve a copy of the notice and a certificate of service on the attorney for the Commonwealth."). Appellant further offers, by reliance upon an unpublished and non-precedential decision of this Court, that Rule 568 notice is not necessary when the expert evidence sought to be introduced challenges the voluntariness of a confession. Appellant's Brief at 62 (citing *Commonwealth v. Winter*, 105 A.3d 36, 1715 MDA 2013 (Pa. Super., filed June 18, 2014)) (unpublished memorandum).

Appellant's argument that the trial court erred in excluding Dickson's expert testimony based upon Pa.R.Crim.P. 568 advances a different legal theory than that presented at trial; therefore, the issue is waived. *See* *Commonwealth v. Rivera*, 238 A.3d 482, 499 (Pa. Super. 2020) (an appellate court cannot review a legal theory in support of a claim unless that particular legal theory was presented to the trial court); *see also* Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Moreover, in *Commonwealth v. Newman*, 555 A.2d 151 (Pa. Super. 1989), this Court explained that the party making an offer of proof waives any grounds other than those actually presented for the trial court's consideration:

> An offer of proof must be sufficient to alert the trial judge to the purpose for which the evidence is being offered, and a trial court's

exclusion of evidence must be evaluated on appeal by a review of the contents of the offer at the time it was made. The party specifying the purpose for which the testimony is admissible cannot argue on appeal that the evidence was admissible for a purpose other than that offered at trial. Appellant is deemed to have waived any grounds, other than those offered at trial, for the admission of the evidence at trial.

*Id.* at 156 (citations omitted).

Here, during a sidebar discussion on the admissibility of Mr. Dickson's testimony, the trial court instructed defense counsel to make an offer a proof. Defense counsel responded: "That [Mr. Dickson] was retained by [co-counsel] to administer an IQ test. He administered the IQ test, and here's the result. . . . That's it." N.T. (Trial), 11/12/19, at 85. This offer of proof does not suffice to preserve the new argument that the trial court abused its discretion in disallowing Mr. Dickson's testimony under Pa.R.Crim.P. 568, the theory now advanced by Appellant. Therefore, Appellant has waived review of this issue.

### *Commonwealth's Information Technology Person*

In his ninth issue, Appellant submits that he is entitled to a new trial because the Commonwealth's use of an information technology ("IT") person to investigate potential jurors gave the Commonwealth an unfair advantage during jury selection. Appellant's Brief at 74. The trial court responded to this allegation of error:

> In addition to the questions posed by counsel, the Pennsylvania Bar Association has stated that it is ethical to also research a potential juror online. *See* [Pa. Bar Association Formal Opinion, American Bar Association (ABA) Formal Opinion 466, 2014-300, Lawyer Reviewing Jurors' Internet Presence, ¶ 9 (2014)]. So long as the research is not so intrusive as to constitute an *ex parte*

communication, the public portions of a potential juror's internet or social network presence is a permissible method of obtaining additional information about that individual. *id.*

The Commonwealth's IT person was accessing public dockets, Google, and Facebook to research the potential jurors. "One of the reasons for this is if one of the jurors would be posting about the case, we feel it's our obligation to let the [c]ourt know about that." Therefore, the research conducted by the Commonwealth's IT person facilitated choosing a fair and impartial jury by weeding out the individuals who had been exposed to excessive publicity about the case.

Furthermore, the defense team had the capability to bring a computer, connect it to the internet, and conduct the same research into the public internet presence of the potential jurors. The Commonwealth did not access any information that the defense team was not also capable of accessing. The mere fact that Appellant and his counsel did not have the foresight to arrange for an individual to assist them in researching during voir dire did not constitute a reason to prohibit the Commonwealth from doing so, so long as everyone complied with the ethical requirements set forth in the PBA Opinion.

Trial Court Opinion, 3/31/20, at 57–58. "The scope of *voir dire* rests in the sound discretion of the trial court, whose decision will not be reversed on appeal absent palpable error." **Commonwealth v. Scott**, 212 A.3d 1094 (Pa. Super. 2019 (citation omitted).

Appellant first avers that nothing in Pa.R.Crim.P. 632, relating to juror's information questionnaires, permits the use of IT personnel during jury selection. Appellant's Brief at 74. We respond simply: The Rule does not prohibit this sort of internet research.

Also, as our independent research did not discover any Pennsylvania case law either interpreting the opinion of the Pennsylvania Bar Association

("PBA") permitting limited online research of potential jurors or independently endorsing such use of social media, we rely on the PBA's opinion sanctioning this form of research. Moreover, we agree with the trial court that the Commonwealth's use of social media during *voir dire* conformed to the dictates of the PBA. When conducting *voir dire*, the Commonwealth utilized its IT person to investigate potential jurors using "public dockets, Google, and Facebook." N.T. (*Voir Dire*), 9/17/19, at 55–56. The prosecution did not use this research to engage in *ex parte* communications or influence prospective jurors.

Thus, what remains is Appellant's bald allegation that he had no ability to employ an IT investigator and his unsupported claim that the Commonwealth received an unfair advantage during jury selection because it had access to social media sites. Appellant's Brief at 74. We agree with the trial court that Appellant is not entitled to relief on these grounds. An IT professional is not required to utilize the social media sites accessed by the Commonwealth. Additionally, Appellant has not explained how researching publically available information on prospective jurors prejudiced him in any significant way, nor how the Commonwealth's internet research deprived him of a fair trial.

### *Motion for Change of Venire*

In his penultimate issue, Appellant alleges that a second error occurred during jury selection when the trial court denied his motion for change in *venire*. Appellant asserts that his motion should have been granted because:

> (i) the pretrial publicity was sensational, inflammatory, and slanted toward conviction; (ii) the publicity mentions prior admissions and confessions of [Appellant] as well as his prior criminal record; (iii) the publicity was derived from prosecuting officers' reports; (iv) the publicity was extensive, sustained and pervasive; [v] the lower court failed to find that pretrial publicity was presumed as inherently prejudicial, contrary to the compelling evidence on this issue; [vi] the lower court failed to find that the publicity was so extensive, sustained, and pervasive that the community was deemed to be saturated with it, and [vii] the lower court failed to withhold its decision in abeyance pending a determination during jury selection that there was a sufficient cooling off period between the publicity and the trial for any prejudice to have dissipated.

Appellant's Brief at 82.

A motion for change of venue or venire "may be" granted "when it is determined after hearing that a fair and impartial trial cannot . . . otherwise be had in the county where the case is currently pending." Pa.R.Crim.P. 584(A). This Court has stated:

> The mere existence of pretrial publicity does not warrant a change of venue. Ordinarily, a defendant is not entitled to a change of venue unless he or she can demonstrate that the pretrial publicity resulted in actual prejudice that prevented the impaneling of an impartial jury. Prejudice will be presumed, however, if the defendant is able to show that the pretrial publicity: (1) was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; (2) revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant; or (3) derived from official police or prosecutorial reports. Even if the defendant proves the existence of one or more of these circumstances, a change of venue is not warranted unless the defendant also

demonstrates that the pretrial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated.

***Commonwealth v. Tharp***, 830 A.2d 519, 529 (Pa. 2003) (citations omitted).

The trial court denied Appellant's change of *venire* motion based upon the following rationale:

> In the instant case, this [c]ourt found that Appellant's pre-trial motions for change of venire were premature. Appellant failed to demonstrate that the recent media coverage was so "extensive, sustained, and pervasive that the community was saturated with it." Therefore, it was necessary for the parties and this [c]ourt to conduct *voir dire* to determine whether the press coverage in this case required a presumption of prejudice. The process gave Appellant the opportunity to demonstrate actual or presumptive prejudice based on the questions asked at *voir dire*. This [c]ourt recognized that, despite the best efforts of the parties, a change of venire may ultimately be necessary; however, that determination could not he made without at least attempting to find twelve members of Appellant's community who could be fair and impartial.

> To that end, the media coverage that Appellant complained of began immediately following the murders in July 2017. The coverage thereafter dissipated or entirely ended in May 2018—a year and a half before the trial actually began on November 6, 2019. Following this [c]ourt's Order of May 23, 2018, the parties refrained from commenting on the case to the media. Although there were several articles announcing the start of jury selection in September 2019, they would more accurately be described as factual summaries of the case rather than inflammatory or prejudicial.

> At *voir dire*, both parties had the opportunity to question each potential juror at length regarding their knowledge of the case. The vast majority of jurors stated that they did not have a fixed opinion of the case, that they would be able to put aside what they thought they knew of the matter to be fair and impartial, and that they would be able to base their decision solely on what was

presented during the course of the trial and follow this [c]ourt's instructions. As such, the parties were able to agree on twelve jurors and six alternates in half the amount of time this [c]ourt and the parties originally anticipated. Therefore, a change of venire was not necessary.

Trial Court Opinion, 3/31/20, at 65–66 (footnote omitted).

It is well-settled that the decision of whether to grant a request for change of venire is within the sound discretion of the trial court. **_Commonwealth v. Chmiel_**, 30 A.3d 1111, 1152 (Pa. 2011) (citation omitted). "This is primarily because the trial court is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change." **_Tharp_**, 830 A.2d at 529.

Appellant first alleges that the trial court failed to withhold its change of _venire_ decision "pending a determination during jury selection that there was a sufficient cooling off period between the publicity and the trial, for any prejudice to have dissipated." Appellant's Brief at 85. This assertion is not supported by the record. At the conclusion of the argument of the change of _venire_ motion at the January 14, 2017 hearing, the trial court chose to take the matter "under advisement." N.T. (Pretrial Hearing), 1/14/19, at 56. After the motion was re-litigated during the April 15, 2019 hearing, the trial court stated: "That motion is denied. Let me say this. It is denied at this time. If during the course of jury selection we reach a point where we realize that we cannot obtain a jury, then we'll take the necessary steps to address it." N.T.

(Pretrial Hearing), 4/15/19, at 86. Thus, contrary to Appellant's recollection, the trial court did not decide the motion at the pretrial stage.

Appellant further distorts the record by claiming that the trial court failed to find that pretrial publicity was presumptively prejudicial in its May 13, 2019 Findings of Fact and Conclusions of Law. Appellant's Brief at 83. However, the only reference to Appellant's motion for change of *venire* in that decision was one line denying the motion, without any elaboration. Findings of Fact and Conclusions of Law, 5/13/19, at 1.

In any event, as our Supreme Court stated in **Commonwealth v. Drumheller**, 808 A.2d 893 (Pa. 2002),

> one who claims that he has been denied a fair trial because of pretrial publicity must show actual prejudice in the empanelling of the jury. In certain cases, however, pretrial publicity can be so pervasive or inflammatory that the defendant need not prove actual juror prejudice. "Pretrial prejudice is presumed if: (1) the publicity is sensational, inflammatory, and slanted toward conviction rather than factual and objective; (2) the publicity reveals the defendant's prior criminal record, or if it refers to confessions, admissions or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports." **Commonwealth v. Weiss**, 565 Pa. 504, 776 A.2d 958, 964 (2001), *petition for cert. filed* (U.S. Mar. 11, 2002) (No. 01–9175).
>
> Even where pre-trial prejudice is presumed, "a change of venue or venire is not warranted unless the defendant also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated." *Karenbauer,* 715 A.2d at 1092.
>
> In testing whether there has been a sufficient cooling period, a court must investigate what a panel

of prospective jurors has said about its exposure to the publicity in question. This is one indication of whether the cooling period has been sufficient. Thus, in determining the efficacy of the cooling period, a court will consider the direct effects of publicity, something a defendant need not allege or prove. Although it is conceivable that pre-trial publicity could be so extremely damaging that a court might order a change of venue no matter what the prospective jurors said about their ability to hear the case fairly and without bias, that would be a most unusual case. Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective. The discretion of the trial judge is given wide latitude in this area.

*Commonwealth v. Chambers,* 546 Pa. 370, 685 A.2d 96, 104 (1996), *cert. denied,* 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997) (citing *Breakiron,* 571 A.2d at 1037–1038, n.1).

***Drumheller***, 808 A.2d at 902–903 (some internal citations and quotation marks omitted).

It is undisputed that the news coverage of these murders and the discovery of the bodies in July 2017 was wide-spread and, often times, dramatic. Additionally, the media reported the confessions of Appellant and DiNardo and Appellant's prior criminal record. However, the latest video Appellant submitted in support of his motion was from May 2018—one and one-half years before the jury selection began in September 2019. For this reason, when Appellant litigated his motion for change of *venire* in January 2019, despite Appellant's contrary representation, the trial court determined that it would revisit whether there was a sufficient cooling-off

period dissipating any prejudice that may have resulted from the news coverage. **See** N.T. (Pretrial Hearing), 1/14/19, at 56 (wherein the trial court took the matter "under advisement"); N.T. (Pretrial Hearing), 4/15/19, at 86 (wherein the trial court deferred a definitive ruling on the motion until *voir dire*). Thus, we will review the propriety of the trial court's denial of the motion in the context of what occurred during *voir dire*.

During *voir dire*, the potential jurors who were questioned about their knowledge of the case responded that they were vaguely familiar with the murders, remembered hearing about them when they happened in the summer of 2017, but did not follow subsequent media coverage of the case, and for the most part, were not familiar with Appellant's participation in the crimes. **See**, N.T. (*Voir Dire*), 9/16/19, at 43–266; 9/17/19, at 30–281; 9/18/19, at 38–235; 9/19/19, at 45–293; 9/20/19 at 37–166. Additionally, the selected jurors represented that their recollection about the publicity surrounding the case did not result in a fixed opinion as to Appellant's guilt or innocence. **See**, N.T. (*Voir dire*)*,* 9/16/19, at 59–266; 9/17/19, at 82–281; 9/19/19, at 56–293; 9/20/19, at 70–166. Appellant does not cite any instance during *voir dire* wherein a juror's response indicated that pretrial publicity compromised his or her ability to listen to the case impartially.

Given the outcome of the juror questioning and the jurors' responses thereto, we find the holding in **Commonwealth v. Robinson**, 864 A.2d 460, (Pa. 2004) instructive:

[A]fter thoroughly reviewing the record we are not persuaded by the complaints made by Appellant. Any potential bias on the part of the jurors in relation to the media coverage of the case was sufficiently dealt with during the individually-conducted voir dire when the defense counsel, the prosecutor, and the trial court, asked the potential jurors whether they had heard or read anything about the case. Indeed, unless preliminarily excused for other, unrelated reasons, each of the prospective jurors was questioned about their familiarity with the case and their knowledge concerning the incidents from media outlets. Some jurors stated that they knew about the incidents and they were further questioned about whether their ability to decide the case would be affected. The record reveals that of the jurors who were aware of the case, most gained their knowledge through the media reports circulated at the time of the victim's homicide and Appellant's apprehension, which was more than a year before the trial was set to begin. This clearly indicates the presence of a sufficient "cooling off period" that minimized any potential ill effects of the publicity surrounding the events at issue.

*Id.* at 485.

After undertaking an independent review of the *voir dire* proceedings, we are convinced that pretrial publicity did not result in an inability to select a fair and impartial jury in Bucks County. Accordingly, insofar as Appellant was not entitled to a change of *venire*, the trial court did not abuse its discretion in denying that motion, and Appellant is not entitled to appellate relief on this basis.

### *Closing Argument*

Appellant's final argument is that the trial court erred in failing to give curative instructions in response to allegedly improper comments during the Commonwealth's closing argument. Appellant's Brief at 76. In his Pa.R.A.P. 1925(b) statement, on this issue, Appellant simply averred that "[t]he lower

court abused its discretion in not ruling comments made by the Commonwealth to the jury during closing arguments with facts that were not in evidence and which prejudiced [Appellant] were improper warranting a curative instruction." Pa.R.A.P. 1925(b) statement, 1/13/20, at 2.

We note that an appellant's 1925(b) statement must identify the specific components of a closing argument with which he takes issue. *Commonwealth v. Hansley*, 24 A.3d 410, 416 n.4 (Pa. Super. 2011). Despite this marked deficiency in Appellant's 1925(b) statement, the trial court discussed the three instances wherein Appellant objected to the Commonwealth's closing argument:

> The first objection raised by Appellant was to the Commonwealth referencing something Attorney Peruto stated in his Opening Statement. During Openings, Attorney Peruto told the jury that Appellant's "got a tested IQ of 79." Over the course of his statement, he mentioned Appellant's IQ twice more. The context of the second two references was to contextualize for the jury that what they would have done were they in Appellant's situation cannot necessarily be applied to Appellant due to his lower IQ. However, as discussed *supra*, Appellant's counsel failed to file a notice of expert witness and the testimony was not permitted. Therefore, during the Closing Argument, the prosecution stated:
>
> > DA Shore: [Appellant] has confessed to first-degree murder.
> >
> > He has no other card to play here with all of you but to blame somebody else, and blame he does. First it's Cosmo, then it's Craig Penglase, then it's that he has a low lQ. His low IQ, what did we hear about that? Zero. Nothing came from the witness stand about that.
> >
> > Mr. Peruto: Objection, Judge. It was objected to.

- 66 -

The Court: Overruled. Go ahead. Move on.

This was a general objection for which Appellant failed to request any remedy. Appellant brought the issue of IQ in, and it was Appellant's own failure for making promises and assertions to the jury without being able to provide them with evidence.

The second objection was promptly sustained by this [c]ourt. The prosecution improperly referenced the fact that Appellant had been shot nineteen times several months prior to the murders, "for which the defendant has no explanation." This was inappropriate for two reasons. First, the parties had agreed not to mention Appellant's prior contact with law enforcement unless Appellant opened the door to that issue. Mention of his gunshot wounds arguably fall under that category. The video statements were specifically redacted to preclude mention of this information. Notably, however Peruto was the one who elicited testimony related to the fact that Appellant had been shot previously. On his cross-examination of Lieutenant Kemmerer, Attorney Peruto asked the detective whether Appellant had offered an explanation as to why he was using crutches and leg braces at the time of the July 13 interview, to which the Lieutenant responded that Appellant "had said he was shot."

Secondly, "for which the defendant has no explanation" is another way of pointing out to the jury that Appellant did not testify in his own defense, but rather exercised his Fifth Amendment rights. Commenting on a defendant's decision not to testify is never appropriate, therefore this [c]ourt sustained the objection and directed the jury to disregard the statement. At no point after this objection did any member of the defense team ask for an additional remedy or curative instruction.

The last objection pertained to the cell phone evidence presented by Detective Eric Landami. Through the cell phone dump, detectives were able to access Appellant's browsing and web search history. There were multiple searches on sneakers and multiple searches on the Pornhub website. There was no objection from the defense team at this time. Later, in his closing, DA Shore referenced the fact that Appellant was "surfing porn" while [Finocchiaro's] family was "worried sick" looking for him. Appellant raised a general objection, which this [c]ourt overruled as the statement was supported by evidence proved at trial. No

further argument was heard, nor any additional request for a remedy or curative instruction.

Finally, in the jury charge, this [c]ourt instructed the jury to base their verdict solely on the evidence presented. There is a presumption that juries follow instructions given by the trial court. *Commonwealth v. Housman*, 986 A.2d 822, (Pa. 2009). The jury was directed to disregard various statements throughout the entirety of the trial. Appellant points to no evidence to overcome the presumption that the jury followed this [c]ourt's instructions.

Trial Court Opinion, 3/31/20, at 60–61 (record references omitted). Despite its discussion of the three objections raised by Appellant during trial, the trial court ultimately determined that this issue was waived. **See** Trial Court Opinion, 3/31/20, at 62 ("Neither did Appellant lodge any specific objections to statements made by the Commonwealth in Closing Arguments, nor did Appellant identify the specific issues he is complaining of on appeal in his 1925[b] Statement. Therefore, this issue is waived on appeal.").

We agree with the trial court that Appellant has waived appellate review of this issue. **See Commonwealth v. Scott**, 212 A.3d 1094, 1113 (Pa. Super 2019) (claim of prosecutorial misconduct during closing argument waived when it was not readily inferable from Appellant's Rule 1925(b) statement).

In his brief, Appellant references three different allegedly objectionable statements by the Commonwealth during closing argument: 1) ADA Shore mentioned that the plea negotiations were done with the victims' families' approval, contrary to the record; 2) ADA Shore repeatedly injected himself into the case by describing his interaction with the victims' families, and law enforcement at the crime scene investigation; and 3) ADA Shore's statement

to the jury that "Nobody can make you take another human life," which Appellant contends contradicted the law and the charging instruction for duress in Pennsylvania. Appellant's Brief at 78–79.

Contrary to his assertion that his "objection was sustained with no curative instruction," Appellant did not object to any of these three purported statements at trial, either immediately after they were spoken or at the conclusion of the Commonwealth's summation. Similarly, the record is void of a defense request for a curative instruction or a mistrial request regarding these statements. An appellant's brief must contain a statement of place of raising or preservation of issues. Pa.R.A.P. 2117(c). This statement must specify the point in the proceedings at which the claims were preserved. *Id.* at (1). ***Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007). Finally, Appellant failed to specifically reference these three claims in his Pa.R.A.P. 1925(b) statement, thereby depriving the trial court of any meaningful opportunity to review them in its Pa.R.A.P. 1925(a) opinion. For these reasons, appellate review of this issue is foreclosed.

For all of the above reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date:4/30/21*